## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

JONELLE GRANT,

          **Plaintiff,**

    vs.

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration,

          **Defendant.**

CASE NO.  4:13CV3031

MEMORANDUM
AND ORDER

This matter is before the Court on the denial, initially and on reconsideration, of the Plaintiff's disability insurance benefits ("DIB") under the Social Security Act ("Act"), 42 U.S.C. §§ 401, *et seq.*, and supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*

### PROCEDURAL HISTORY

Plaintiff applied for DIB on January 14, 2008. (Tr. 101, 275–82, 283–86.) Her applications were denied initially on March 12, 2008, and again on reconsideration on May 12, 2008, and she appealed the denial to an ALJ. (Tr. 101, 119, 142, 150, 155.) The ALJ issued an unfavorable decision on December 31, 2009. (Tr. 123–31.) On March 2, 2011, the Appeals Council reversed the ALJ's decision and remanded the case to a different ALJ for further consideration and a new decision. (Tr. 138–40.)

The ALJ held a second administrative hearing on May 18, 2011. (Tr. 80–100.) In the new decision, dated June 23, 2011, the ALJ found that Plaintiff was not disabled under the Act.  (Tr. 37–48.) The ALJ found that Plaintiff had the severe impairments of cervical degenerative disc disease, fibromyalgia, affective mood disorder, and anxiety disorder. (Tr. 40.) The ALJ determined that Plaintiff nevertheless retained the residual

functional capacity to perform a reduced range of sedentary work. (Tr. 41.) After consulting a vocational expert, the ALJ concluded that Plaintiff's impairments would not prevent her from performing work that exists in significant numbers in the national economy, including work as a weight tester, cutter/paster, or administrative support worker. (Tr. 47.) The Appeals Council denied Plaintiff's request for review of the new ALJ decision on December 12, 2012. (Tr. 1.) The Act provides for judicial review of a "final decision" of the Commissioner of the Social Security Administration. *See id.* §§ 405(g), 1383(c)(3). The new ALJ decision is therefore a "final decision" subject to judicial review under 42 U.S.C. § 405(g).

## FACTUAL BACKGROUND

### I.   Documentary Evidence

Plaintiff holds a GED, and completed two years of college courses. (Tr. 84–85.) Before her alleged disability began, Plaintiff worked in several customer-service jobs, including gas-station clerk and waitress. (Tr. 322.) On June 23, 2011, the date of the ALJ's second decision, Plaintiff was forty-six years old. (Tr. 48, 101.)

Plaintiff was involved in a serious automobile accident on April 17, 2007. (Tr. 87.) Plaintiff testified she became disabled as a result of the accident. (Tr. 321). Plaintiff saw Dan Nguyen, M.D., on April 25, 2007, and reported neck and back pain following the car accident.[1] (Tr. 482.) During a follow-up appointment on May 2, 2007, Dr. Nguyen diagnosed a cervical strain and referred Plaintiff for physical therapy. (Tr. 818.) Plaintiff began attending regular physical therapy on May 9, 2007. (Tr. 527, 544, 824–33.)

---

[1] Plaintiff saw Dr. Nguyen about thirteen times from October 2008 through August 2010. (Tr. 734, 735, 736, 737, 738, 739, 740, 741, 742, 743, 843, 844, 845.) It is undisputed that he is a treating physician.

Plaintiff's first physical therapist, Jason Merz, noted that Plaintiff's current symptoms included neck pain, constant ache and burning in back. (Tr. 527.) Merz noted that Plaintiff reported that her pain was constant, worsened as the day progressed, and that activity of any kind increased her symptoms. (Tr. 527.)

Plaintiff saw Dr. Nguyen three more times in May 2007. (Tr. 478, 481, 483.) On May 29, 2007, Plaintiff complained of ongoing neck pain despite physical therapy, and Dr. Nguyen ordered an MRI of her cervical spine. (Tr. 478.) The MRI showed a diffuse disc bulge and moderate degenerative changes at the C4–C5 levels, a diffuse bulge at the C5-C6 level, and mild degenerative changes at the C2–C4 level. (Tr. 520.)

In June and July 2007, Plaintiff reported ongoing neck pain to Dr. Nguyen. (Tr. 476, 479.) She said that physical therapy was not helpful anymore. (Tr. 476.) Dr. Nguyen referred Plaintiff to Adeleke Badejo, M.D., a neurologist. (Tr. 476.) Dr. Badejo examined Plaintiff on August 22, 2007. (Tr. 502–04.) Plaintiff complained of pain in her right shoulder and arm. (Tr. 502.) However, Dr. Badejo found that she had normal cranial nerves, motor and sensory function, and reflexes. (Tr. 504.) After reviewing MRI results, Dr. Badejo felt that Plaintiff's C4–C5 disc herniation likely caused her symptoms and recommended surgery. (Tr. 504.) Dr. Badejo also referred Plaintiff to a psychiatrist at Dr. Nguyen's suggestion. (Tr. 504.) Plaintiff saw Dr. Nguyen again on August 24, 2007. (Tr. 477, 750.)

On September 12, 2007, Plaintiff saw Hugo Gonzalez, M.D., a psychiatrist, on referral from Dr. Badejo. (Tr. 488–89.) Plaintiff complained that she had been depressed for "most of [her] life." (Tr. 488.) Dr. Gonzalez observed that Plaintiff was pleasant and cooperative, with a restricted affect, appropriate thought content, fair-to-good insight

and judgment, normal memory, and a normal fund of knowledge. (Tr. 489.) He diagnosed major depressive disorder, and assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 65. (Tr. 489.) He also prescribed an antidepressant. (Tr. 489.)

On October 10, 2007, Plaintiff saw Clint Malcolm, APRN, who worked in Dr. Gonzalez's office. (Tr. 486.) Plaintiff reported that her mood was much better thanks to her antidepressant. (Tr. 486.) Mr. Malcolm observed that Plaintiff had intact recent and remote memory, "fine" attention and concentration, fair insight and judgment, and a logical thought process. (Tr. 486.) Plaintiff also saw Dr. Badejo that day. (Tr. 505.) Dr. Badejo's examination findings were normal. (Tr. 505.) Plaintiff agreed to go forward with discectomy and fusion procedures at the C4-C5 level. (Tr. 505.) Dr. Badejo performed the procedure on October 16, 2007. (Tr. 497.) Afterward, Plaintiff received prescriptions for opioid pain medication. (Tr. 496.)

During an appointment with Dr. Gonzalez on November 7, 2007, Plaintiff reported that her recent surgery improved her pain somewhat. (Tr. 485.) She said she was less depressed, and her anxiety was completely under control. (Tr. 485.) Plaintiff had a "close to neutral" mood, a somewhat restricted affect, fair insight and judgment, and a coherent thought process. (Tr. 485.) Dr. Gonzalez increased her GAF score to 70. (Tr. 485.) On the same day, Plaintiff visited Dr. Badejo and complained of mild discomfort in the neck. (Tr. 506.) Motor and sensory exams were normal, and Plaintiff had normal reflexes. (Tr. 506.) Dr. Badejo gave her instructions for neck exercises. (Tr. 506.) Updated cervical-spine x-rays showed that Plaintiff's bone graft was stable. (Tr. 769.)

4

Dr. Badejo saw Plaintiff for a follow-up appointment on November 29, 2007. (Tr. 507.) Plaintiff complained of discomfort in her shoulders, but she had normal range of motion in her cervical spine, and normal motor and sensory function. (Tr. 507.) Dr. Badejo recommended another round of physical therapy and prescribed a non-steroidal anti-inflammatory drug. (Tr. 507.) He also gave Plaintiff a transcutaneous-electrical-nerve-stimulation ("TENS") unit for a home trial. (Tr. 813.) Plaintiff began her second course of physical therapy on December 6, 2007. (Tr. 529, 654, 819–22.) She completed physical therapy on January 14, 2008. (Tr. 654, 821.)

Dr. Gonzalez saw Plaintiff again on January 23, 2008. (Tr. 547.) Plaintiff reported that she recently had an unexpected miscarriage, and her mother passed away. (Tr. 547.) She said she was handling these losses fairly well. (Tr. 547.) Plaintiff was pleasant and cooperative, with a depressed mood, a bright affect, and fair insight and judgment. (Tr. 547.) Dr. Gonzalez once again assessed a GAF score of 70. (Tr. 547.) He also prescribed a new antidepressant. (Tr. 547.)

That same day, Plaintiff saw Dr. Badejo. (Tr. 591.) Dr. Badejo noted mild tenderness in Plaintiff's shoulders. (Tr. 591.) Motor, sensory, and reflex exams were normal, and Plaintiff had normal range of motion in her neck. (Tr. 591.) Dr. Badejo gave Plaintiff a two-week supply of Valium and advised her to apply heat, do neck exercises, and use her TENS unit. (Tr. 591.)

An x-ray of Plaintiff's spine taken on February 12, 2008, showed normal alignment, moderate spondylosis at the C5–C6 level, and mild change at the C6–C7 level. (Tr. 549.) During a February 13, 2008, appointment, Dr. Badejo noted that x-rays

showed Plaintiff's bone graft remained in good position. (Tr. 593.) He encouraged Plaintiff to begin neck and back exercises. (Tr. 593.)

Plaintiff saw Dr. Nguyen on March 8, 2008. (Tr. 746.) On April 4, 2008, she complained to Dr. Badejo about tenderness in her shoulders. (Tr. 592.) Dr. Badejo found that Plaintiff had normal cervical spine range of motion. (Tr. 592.) Sensory, motor, and reflex examinations were normal. (Tr. 592.) He gave Plaintiff a muscle relaxant, and advised her to apply heat if her pain worsened. (Tr. 592.)

Sarah Schaffer, Ph.D., completed a consultative psychological evaluation of Plaintiff on February 25, 2008. (Tr. 550–54.) Plaintiff reported that she was divorced and currently lived with her father. (Tr. 550.) She described great relationships with her daughter and grandchildren. (Tr. 551.) Plaintiff reported episodic depression beginning when she was a teenager. (Tr. 551.) During Dr. Schaffer's examination, Plaintiff had intact memory, logical thought processes, a "slightly blunted" affect, clear speech, fair insight and judgment, and poor self-esteem. (Tr. 552-53.) Dr. Schaffer noted that Plaintiff reported difficulty with concentration and adjusting to change. (Tr. 553.) She assigned Plaintiff a GAF score of 65. (Tr. 553.)

Leland Lamberty, M.D., completed a consultative physical exam on March 5, 2008. (Tr. 555–58.) Plaintiff told Dr. Lamberty that she could not do any significant physical activity following her car accident and discectomy procedure. (Tr. 555.) She complained of pain and numbness in her neck, shoulders, and arms. (Tr. 555.) In his examination notes, Dr. Lamberty remarked that Plaintiff "does not give the impression ... of being in excruciating pain and seems to sit quite comfortably." (Tr. 556.) Dr. Lamberty noted Plaintiff had tenderness in her cervical spine, mild tenderness in her shoulders,

6

and very good range of motion in her neck. (Tr. 557.) She had intact cranial nerves, no motor or sensory deficits, equal reflexes, and "good" range of motion in her arms and legs. (Tr. 557.) Although she had "mild" tenderness in her back, she also had "excellent" spine range of motion. (Tr. 557.)

Dr. Lamberty's diagnoses included chronic neck pain and intermittent numbness and weakness in Plaintiff's arms. (Tr. 557.) Dr. Lamberty felt Plaintiff's description of severe pain to be genuine, but Plaintiff could move her head and neck slowly, tilt her head, shake her head slightly in agreement, and move her head side-to-side without apparent discomfort. (Tr. 558.) Dr. Lamberty felt Plaintiff could not perform strenuous activities. (Tr. 558.) However, he felt she could perform sedentary activity that did not require a lot of head movement. (Tr. 558.)

On March 8, 2008, Jerry Reed, M.D., an agency physician, completed a physical assessment based on Plaintiff's medical records. (Tr. 560–68.) Dr. Reed believed Plaintiff could lift and carry up to ten pounds frequently and up to twenty pounds occasionally, and could sit for up to six hours and stand or walk for up to six hours during an eight-hour workday. (Tr. 561.) Plaintiff could frequently balance, stoop, kneel, crouch, and crawl, and had unlimited handling, fingering, and feeling capabilities. (Tr. 562, 563.) He also felt that Plaintiff could occasionally climb ramps or stairs and would have difficulty with repetitive overhead reaching. (Tr. 562-63.) A second agency physician, A.R. Hohensee, M.D., assigned similar limitations in an assessment completed on May 8, 2008. (Tr. 595–603.)

On March 9, 2008, Lee Branham, Ph.D., a state agency psychologist, completed a mental assessment based on the record. (Tr. 569–71.) Dr. Branham felt Plaintiff would

7

have difficulty with social interaction, maintaining concentration, and adapting to change, but would not have any marked psychological limitations. (Tr. 571.) He believed Plaintiff could handle at least simple instructions. (Tr. 571.) Linda Schmechel, Ph.D., a second agency psychologist, affirmed Dr. Branham's assessment on May 7, 2008. (Tr. 594.)

Dr. Nguyen examined Plaintiff again on March 18, and June 9, 2008 (Tr. 588–89, 745), and again on September 21, 2008. (Tr. 744.) Plaintiff continued to report neck pain. (Tr. 588, 745.)

On August 19, 2009, Jake DeNell, a physical therapist, completed a functional evaluation at the request of Plaintiff's attorney. (Tr. 605–19.) Mr. DeNell concluded that Plaintiff could "work in the modified light category of work for an 8-hour workday." (Tr. 605.) Specifically, Mr. DeNell felt Plaintiff could lift and carry fifteen pounds frequently and up to twenty pounds occasionally; should not rotate her neck more than occasionally; had to "work with her neck in a neutral position"; should not perform overhead work more than occasionally; and could sit or stand for up to one hour at a time before changing positions. (Tr. 607-08.) Mr. DeNell noted that Plaintiff had "a high amount of perceived disability;" and he encouraged her to "return back to work within the guidelines specified by this [exam] as soon as possible." (Tr. 608.)

On December 17, 2008, Plaintiff saw David Rutz, M.D., "for an opinion regarding fibromyalgia." (Tr. 724–25.) Plaintiff told Dr. Rutz that she was diagnosed with fibromyalgia in 2002 and continued working until April 2007, when a car accident caused her condition to worsen. (Tr. 724.) Plaintiff said she received disability payments from an insurer following the car accident, but the payments stopped, presumably

8

because the insurance company felt she could return to work. (Tr. 724.) During his exam, Dr. Rutz noted that Plaintiff had significant trigger points. (Tr. 725.) His neurological exam was "normal." (Tr. 725.) Dr. Rutz opined that Plaintiff's "pre-existing fibromyalgia" had "significantly worsened as a result of a car accident of April 2007 to the point where she can no longer be fully employed." (Tr. 725.)

In a January 15, 2008, letter to Plaintiff's attorney, Dr. Rutz said that Plaintiff's fibromyalgia would affect her cognitive function. (Tr. 722.) Dr. Rutz acknowledged Mr. DeNell's functional evaluation, but questioned whether Plaintiff "whould [sic] be able to get herself out of bed to report to work." (Tr. 722.) He also indicated that Plaintiff should try certain fibromyalgia medications, although possible side effects included fatigue and sedation, which "could play a part in restricting her ability to work." (Tr. 722.)

On September 13, 2010, Plaintiff saw Bridget Pettit, a therapist, and complained of depression. (Tr. 850–55.) Ms. Pettit found that Plaintiff was oriented and cooperative, with a blunted affect, an anxious and depressed mood, slowed thought process, average intelligence, reduced attention and concentration, fair judgment, and limited insight. (Tr. 853.) Ms. Pettit diagnosed major depressive disorder and personality disorder, and assigned Plaintiff a GAF score of 45.[2] (Tr. 854–55.) Plaintiff continued to see Ms. Pettit for weekly therapy sessions. (Tr. 856, 858, 859, 860, 892–908.) Her treatment goals included improved sleep, coping with loneliness, and stress management. (Tr. 860.)

---

[2] A GAF score of 41 to 50 indicates "serious" symptoms. *See Diagnostic and Statistical Manual of Mental Disorders*, *DSM-IV-TR*, American Psychiatric Association, at 34 (4th ed., text rev. 2000).

Tamara Johnson, M.D., who worked in the same office as Ms. Pettit, saw Plaintiff for an initial medication assessment on December 15, 2010. (Tr. 874–79.) Plaintiff told Dr. Johnson that she used an antidepressant over the last three years, but found it ineffective. (Tr. 878.) Plaintiff appeared oriented, and had good motor function, a cooperative attitude, normal speech, pleasant affect, unremarkable thought content, average intelligence, good attention and concentration, fair judgment, and "improving" insight. (Tr. 877.) Dr. Johnson diagnosed bipolar disorder, generalized anxiety disorder, and personality disorder, and assigned Plaintiff a GAF score of 49 (Tr. 878-79.) She also prescribed new mood medications. (Tr. 878.)

Plaintiff saw Dr. Nguyen once again on February 8, 2011. (Tr. 872.) Plaintiff asked for pain-medication refills and a prescription for fibromyalgia medication. (Tr. 872.) Dr. Nguyen refilled Plaintiff's prescriptions and prescribed a fibromyalgia drug. (Tr. 872.)

## II.    Testimony at the Administrative Hearing

During the May 18, 2011, hearing. (Tr. 80–100), Plaintiff said her current pain was at eight on a ten-point scale. (Tr. 88.) She testified that her condition had worsened since the accident and the first hearing in this case and that the pain medication did not help as much as it used to and she was rarely pain free. (Tr. 88.) She sometimes had numbness in both arms and muscle spasms. (Tr. 89.) Plaintiff testified that she was no longer able to do laundry or cook for herself, and required assistance from her daughter. (Tr. 86.) Plaintiff's daughter also helped with shopping because it was too difficult for Plaintiff to push the shopping cart, and Plaintiff was unable to carry heavy bags. (Tr. 95.) Plaintiff testified that she had difficulty bathing because she would become tired

10

getting in and out of the shower, and it hurt to wash her hair. (Tr. 94.) Plaintiff stated that she was unable to do housework. (Tr. 94.) Plaintiff also testified that she could not use her computer because she was unable to sit at a desk and work due to pain in her neck and shoulders. (Tr. 85.) Plaintiff had difficulty driving because at times she had problems turning her neck to check for traffic. (Tr. 85-86.) She claimed she did not like driving because the medications made her feel "floaty." (Tr. 93-94.) Plaintiff also testified that she could only walk for one block, found it hard to turn her head, and could not lift any amount of weight above her shoulders. (Tr. 45, 86, 95.)

Plaintiff added that she suffered from irregular sleep patterns and, when she was able to sleep, would sleep for 12-16 hours and still feel tired. (Tr. 88, 91.) Further, she seldom attended social functions due to pain, or as a result of her sleeping patterns. (Tr. 86, 89.) Plaintiff testified that she also suffered from depression and anxiety which was treated with Cymbalta, and had crying spells that lasted more than an hour. (Tr. 91-92.) Plaintiff complained of memory problems and fatigue caused by fibromyalgia. (Tr. 92-93.)

The ALJ asked a vocational expert to consider a hypothetical claimant with the same limitations the ALJ ultimately included in his residual-functional-capacity finding. (Tr. 98.) The vocational expert testified that the hypothetical claimant could not perform any of Plaintiff's past jobs, but could perform the sedentary, unskilled jobs of weight tester, cutter/paster, and administrative support worker. (Tr. 98-99.)

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues de novo.  Rather, the

11

district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision. *Howe v. Astrue*, 499 F.3d 835, 839 (8th Cir. 2007).

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Carlson v. Astrue*, 604 F.3d 589, 592 (8th Cir. 2010). As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *Frederickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir. 2004).

## DISCUSSION

The Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff was not disabled under the Act. In a disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind

12

of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); *see also Bowen v. Yuckert,* 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); *see also Bowen,* 482 U.S. at 140–41 (explaining five-step process).

Plaintiff asserts several assignments of error, including that the ALJ failed to give appropriate weight to the Plaintiff's testimony and that of her treating physicians, and that the ALJ erred in finding that Plaintiff was capable of work. For the reasons discussed below, the ALJ's conclusions are supported by substantial evidence in the record.

## I.    Credibility of Plaintiff's Testimony

Plaintiff argues that the ALJ failed to adequately explain why he found the Plaintiff's testimony was not credible. The ALJ has a duty to examine a claimant's subjective complaints of pain, even if the objective medical evidence does not support such complaints.  See *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  When considering subjective complaints of pain, in addition to the objective medical evidence, the ALJ must consider the claimant's daily activities; the duration, frequency and intensity of the pain; dosages, effectiveness and side effects of medication; and functional restrictions. *Id.* "When making a determination based on these factors to reject an individual's complaints, the ALJ must make an express credibility finding and give his reasons for discrediting the testimony." *Shelton v. Chater,* 87 F.3d 992, 995 (8th Cir. 1996) (citing *Hall v. Chater*, 62 F.3d 220, 223 (8th Cir.1995)).

Plaintiff argues that the ALJ failed to address some of the *Polaski* factors and did not detail his reasons for his findings with respect to the others. The Court first notes that there is no requirement that an ALJ cite the *Polaski* decision or discuss every *Polaski* factor.  It is sufficient if *Polaski* factors are referenced and considered and that an ALJ's credibility findings are adequately explained and supported.  *Steed v. Astrue,* 524 F.3d 872, 876 (8th Cir. 2008); *Lowe v. Apfel,* 226 F.3d 969, 972 (8th Cir. 2000).  In

this case, the ALJ concluded that Plaintiff's testimony was not fully credible for several reasons, including contrary medical opinion evidence, the lack of objective evidence to support Plaintiff's complaints, Plaintiff's minimal pain treatment, and her demeanor during the hearing. (Tr. 44–46.)

The Court concludes that the ALJ's credibility findings with respect to Plaintiff's complaints of physical pain are supported by substantial evidence in the record. When evaluating symptoms, the SSA considers "medical opinions of … treating sources and other medical opinions." 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). At the hearing, Plaintiff testified that she could walk for one block, found it hard to turn her head, could not lift any amount of weight above her shoulders, and experienced constant, widespread pain with a severity of eight on a ten-point scale. (Tr. 45, 86, 88, 95.) Plaintiff also complained of memory problems, and testified that her medications made her tired and "floaty," to the point that she could not drive safely. (Tr. 45, 92–94.)

In contrast, the ALJ specifically identified the observation of Dr. Lamberty following a consultative examination that Plaintiff did not appear to be in excruciating pain, and his medical opinion that Plaintiff should not perform "strenuous" activity but seemed capable of performing sedentary activity that did not require frequent head turning." (Tr. 43, 556, 558.) The ALJ also noted Mr. DeNell's physical assessment resulting in the conclusion that Plaintiff could work "in the modified light category" notwithstanding her impairments. (Tr. 43, 605.) Mr. DeNell opined that Plaintiff was able to lift and carry up to twenty pounds occasionally, could sit or stand for only one hour at a time, and should not perform overhead work more than occasionally. (Tr. 43, 607-08.) Mr. DeNell encouraged Plaintiff to return to work "as soon as possible." (Tr. 608.) These

15

objective medical assessments support the ALJ's credibility determination with respect to Plaintiff's physical limitations.

The ALJ's credibility finding with respect to Plaintiff's mental limitations is also supported by substantial evidence. For example, the ALJ relied on the evaluation of Dr. Schaffer following a February 2008 consultative evaluation. (Tr. 44, 550-54.) Dr. Schaffer diagnosed Plaintiff with major depressive disorder, and reported that Plaintiff had difficulties with concentration and adjusting to change. (Tr. 44, 553.) However, Dr. Schaeffer also observed that Plaintiff was attentive and had intact memory. (Tr. 552.) Dr. Schaffer assigned Plaintiff a GAF score of 65, consistent with only "mild" symptoms. *See* DSM-IV-TR, *supra*, at 34. Dr. Schaffer's assessment contradicted the Plaintiff's testimony with respect to her mental impairments.

The ALJ also discussed Plaintiff's failure to pursue specialized treatment for her fibromyalgia. (Tr. 46.) A claimant's allegations may be discredited by evidence that the claimant has received minimal treatment when compared to the symptoms he alleges. *See Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir.2006) (upholding credibility determination in light of "absence of hospitalizations ..., limited treatment of symptoms, [and] failure to diligently seek medical care"); *Singh v. Apfel*, 222 F.3d 448, 453 (8th Cir.2000) (stating that allegations of disabling pain are discredited by "evidence that the claimant has received minimal medical treatment and/or has taken only occasional pain medications.") The ALJ recognized that although Plaintiff testified to widespread, constant, and pervasive pain, she never sought a pain specialist or rheumatologist for her complaints of pain. (Tr. 44, 46.)

16

The ALJ also noted that the Plaintiff's demeanor at the hearing also undermined her credibility. "[An] ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations." *Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir.2008) (holding that an ALJ "is in the best position" to assess credibility because he is able to observe a claimant during his testimony).   The ALJ observed that although the Plaintiff testified about memory loss, she was able to recall her symptoms and medical history without significant difficulty. (Tr. 45.)

The Court must defer to the ALJ's determination regarding the credibility of testimony as long as it is supported by good reasons and substantial evidence. *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) (citing *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir.2006)). Having reviewed the evidence that both supports and detracts from the ALJ's decision, *see Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir.2012) (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir.2005)), the Court concludes that the ALJ's credibility determination with respect to Plaintiff's testimony is supported by substantial evidence.

## II.    Residual Functional Capacity

Plaintiff also argues that the ALJ's determination of Plaintiff's residual functional capacity ("RFC") was not based on reliable evidence in the record. "RFC is defined as the most a claimant can still do despite his or her physical or mental limitations." *Leckenby v. Astrue,* 487 F.3d 626, 631 n. 5 (8th Cir.2007).   "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."   *Vossen v. Astrue,* 612 F.3d 1011, 1016 (8th Cir.2010).   "The RFC must (1) give 'appropriate

consideration to all of [the claimant's] impairments,' and (2) be based on competent medical evidence establishing the 'physical and mental activity that the claimant can perform in a work setting.'" *Partee v, Astrue,* 638 F.3d 860, 865 (8th Cir. 2011) (quoting *Ostronski v. Chater,* 94 F.3d 413, 418 (8th Cir.1996)).  In determining RFC, an ALJ should consider "[m]edical records, physician observations, and the claimant's subjective statements about [her] capabilities."  *Id.* (citing *Eichelberger v. Barnhart,* 390 F.3d 584, 591 (8th Cir.2004)).

At the second step of the disability evaluation, the ALJ found that Plaintiff had the severe impairments of cervical degenerative disc disease, fibromyalgia, affective mood disorder, and anxiety disorder. (Tr. 40.) After considering all evidence in the record, including the Plaintiff's testimony where credible, the ALJ found that Plaintiff had the following abilities: she could lift and carry up to twenty pounds occasionally and ten pounds frequently; walk or stand for one hour at a time and for six total hours in an eight-hour workday; and sit for one hour at a time and for six total hours in an eight-hour workday. (Tr. 41-42.) The ALJ also found that Plaintiff could climb ramps and stairs, and could occasionally stoop, crouch, kneel, crawl, or perform overhead reaching, but had to avoid hazards. (Tr. 42.) The ALJ recognized Plaintiff's mental impairments and chronic pain, and accordingly limited Plaintiff to jobs that did not demand attention to detail, close cooperation with coworkers, or more than occasional interaction with the public. (Tr. 42.)

The ALJ concluded that Plaintiff could not return to the customer-service jobs she performed in the past, but found that Plaintiff could perform other work existing in significant numbers in the national economy. (Tr. 46.) The ALJ supported this finding by

questioning a vocational expert about a hypothetical claimant with Plaintiff's background and residual functional capacity. (Tr. 99.) *See Cox v. Astrue*, 495 F.3d 614, 620 (8th Cir. 2007) (a vocational expert's response to a complete and correctly-phrased hypothetical provides substantial evidence for the ALJ's step-five conclusion). The record demonstrates that the ALJ's hypothetical questions fully accounted for Plaintiff's credible pain complaints. *See Harvey v. Barnhart*, 368 F.3d 1013, 1016 (8th Cir. 2004). The vocational expert testified that a hypothetical claimant with Plaintiff's residual functional capacity could perform the sedentary, unskilled jobs of weight tester, cutter/paster, and administrative support worker. (Tr. 99.) Based on this testimony, the ALJ concluded that Plaintiff could perform these jobs, and was therefore not disabled under the Act. (Tr. 47.)

The record demonstrates that the ALJ properly considered the evidence and reconciled inconsistencies in his conclusion. For example, the ALJ's conclusion relied on the consultative opinions of Dr. Lamberty and Dr. Schaffer, and Mr. DeNell's functional evaluation.  As stated above, Dr. Lamberty felt that Plaintiff should be limited to non-strenuous sedentary work, while Mr. DeNell felt Plaintiff could perform a range of light work. (Tr. 558, 608.) The ALJ also relied on the non-examining assessments from Dr. Reed and Dr. Hohensee.  (Tr. 43.) Drs. Reed and Hohensee both felt Plaintiff could lift up to twenty pounds occasionally, and could sit for up to six hours and stand or walk for up to six hours in an eight-hour workday, but would have difficulty with overhead reaching. (Tr. 561–63, 596–98.) In weighing these assessments and considering all the evidence, the ALJ assigned greater restrictions. (Tr. 43, 608.) The ALJ accounted for Plaintiff's mild attention deficit and social limitations by restricting Plaintiff to jobs that did

not require attention to detail or close cooperation with others. (Tr. 42.) The record demonstrates that the ALJ thoughtfully considered the evidence in reaching his conclusion.

Plaintiff argues that the ALJ should have relied on the opinions of Dr. Nguyen and Dr. Rutz in determining the Plaintiff's RFC. With respect to Dr. Nguyen, Plaintiff argues that the ALJ should have requested an opinion or interrogatory from Dr. Nguyen because the ALJ dismissed Dr. Nguyen's records as illegible. Plaintiff cites the ALJ's duty to fully develop the administrative record. "A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record." *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005). "Although that duty may include re-contacting a treating physician for clarification of an opinion, that duty arises only if a crucial issue is undeveloped." *Id.* Plaintiff does not allege that the record is missing any relevant medical records. In fact, Plaintiff alleged that her medical records consistently reflected a fibromyalgia diagnosis. (Filing No. 13 at 8; Tr. 485, 502, 547, 553, 854, 884, 982, 990, 995.) Thus, there was substantial evidence of such a diagnosis and it cannot be said that the issue was underdeveloped. The assessments and medical records provide substantial evidence supporting the ALJ's RFC conclusion. Accordingly, the ALJ was not required to contact Dr. Nguyen to develop the record.

Plaintiff also argues that ALJ failed to give controlling weight to Dr. Rutz as a treating physician. Dr. Rutz examined Plaintiff on December 17, 2008, and his primary diagnosis was fibromyalgia. (Tr. 724, 725.) Dr. Rutz also noted that the car accident in April 2007 exacerbated her symptoms to the point that she could no longer be fully employed. (Tr. 725.) In a letter dated January 15, 2009, Dr. Rutz noted a functional

capacity examination performed by Mr. DeNell that indicated she could work in a full-time, modified light capacity, but expressed concern as to whether Plaintiff would be able to "get herself out of bed to report to work." (Tr. 722.)

The ALJ did not give controlling weight to Dr. Rutz's opinions because they were poorly documented. (Tr. 43-44.) The Court finds this conclusion is supported by substantial evidence in the record. According to the record, Dr. Rutz examined Plaintiff only once. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (stating that when considering the weight according to a treating source, ALJ considers length, nature and extent of the treating relationship). Further, poorly documented conclusions may affect the weight given to a treating source. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion."). The ALJ noted that Dr. Rutz considered Plaintiff's overall ability to work, rather than her specific limitations. (Tr. 44.) For example, Dr. Rutz opined that Plaintiff could not be "fully employed," but he did not explain what specific limitations would preclude all work. (Tr. 722.) Because the issue of overall disability is not a medical question, the ALJ was justified in assigning little weight to Dr. Rutz's conclusion. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d) (describing opinions on issues reserved to the Commissioner). The ALJ provided substantial reasons for his decision on the weight given to Dr. Rutz.[3]

_____

[3] Plaintiff also argues the ALJ failed to give controlling weight to Ms. Freeman's vocational assessment. Ms. Freeman's assessment was based on the report of Dr. Rutz. (Tr. 436.) Rather than offer an opinion on functional limitations, the assessment simply stated that a person with the limitations described in Dr. Rutz's opinion would be unable to find work. (Tr. 436.) Because the ALJ did not credit Dr. Rutz's opinion, Ms. Freeman's assessment was unhelpful. (Tr. 46.) For the reasons discussed above with respect to Dr. Rutz, substantial evidence supported the ALJ's conclusion.

Plaintiff argues that the ALJ failed to give controlling weight to Dr. Johnson, Plaintiff's treating psychiatrist. After administering a mood disorder questionnaire, Dr. Johnson noted Plaintiff's issues with anger and panic among the symptoms of her depression. (Tr. 1068.) Dr. Johnson assigned Plaintiff a GAF score of 49, which, as indicated above, indicates serious symptoms of impairment in social, occupational, or school functioning. *See DSM-IV-TR*, *supra*, at 34. The ALJ stated that the GAF score of 49 indicated "that the claimant's functioning was good and would presumably improve when she resumed the medication treatment she had abandoned for several years." (Tr. 45.) The ALJ's misstatement or lack of clarity with respect to the GAF score did not invalidate his conclusion. The ALJ specifically referenced Plaintiff's medication, and noted that Dr. Johnson's assessment reflected Plaintiff's functioning before Dr. Johnson prescribed medication to treat her mood symptoms. (Tr. 45.) This was significant because Plaintiff achieved GAF scores of 65 to 70 during an earlier period of treatment with medication. (Tr. 44, 485, 489, 547.) Accordingly, the weight given to Dr. Johnson's conclusions were explained and supported by substantial evidence.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and should be affirmed. Accordingly,

IT IS ORDERED:

1.      The Commissioner's decision is affirmed;

2.      The appeal is denied; and

22

3.    Judgment in favor of the Defendant will be entered in a separate

document.


Dated this 4th day of February, 2014.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge